No. 14,783.

BARTH *v.* TITUS ET AL.
(117 P. [2d] 480)

Decided September 8, 1941.   Rehearing denied September 29, 1941.

Mr. ALBERT J. GOULD, Mr. VERNON V. KETRING, for plaintiff in error.

Mr. CHARLES T. MAHONEY, Mr. CHARLES A. MURDOCK, Mr. GEORGE E. REED, for defendant in error Ketha S. Titus.

*En Banc.*

MR. JUSTICE HILLIARD delivered the opinion of the court.

SUIT by a mother against her daughter to rescind a contract for support, and to compel reconveyance of real property. The daughter, while admitting she received from her mother conveyance of the property involved, alleged that the transaction was a voluntary gift, with no conditions attaching. Further, although denying any contractual obligation to that end, she alleged that she provided her mother "with a good, comfortable home," and in doing so was prompted solely by a "daughter's devotion." The court found that the conveyance "was in consideration of the support of her mother," as she claimed, but, concluding that such support only had failed when the mother "put it out of the power of the daughter to perform the contract, and left the home provided by the daughter without just cause," adjudged that the complaint be dismissed.

In the mother's behalf it is urged, that, considering the favorable finding for her on the principal issue, and the unhappy relations obtaining between the parties as shown by the record, a situation was developed, which, by the application of wise and just rules of law and equity, required entry of judgment in her favor. The point will be discussed following the disposition of the daughter's cross-error, for which we pause. Her challenge is that the court erred in finding for the mother as to the consideration for the conveyance. While

there was evidence otherwise, as would be expected, we think the mother's version was sufficiently supported to warrant the court's finding. In any event, as seems clear, the record does not justify its disturbance at our hands.

It appears that in 1929, plaintiff's husband, and father of defendant (there was another daughter and a son), departed this life; that he left an estate of the value of about one hundred thousand dollars, consisting largely of unencumbered Nebraska and Colorado farms, and the Denver residence property involved in this suit; that other than bequests of two thousand dollars to each of the children, he willed his entire estate to plaintiff; that shortly after probate of the will and settlement of the estate, the mother, saving to herself only the said residence property, conveyed to the children, in separate parcels, all of the considerable landed estate appearing, but in which she reserved a life estate; that in 1931, the mother went to Pittsburgh, Pennsylvania, to make her home with her daughter (defendant); that in 1932, and while the mother was living in the home of said daughter, she conveyed to her the Denver residence property, by deed containing no reservations. In relation to the consideration for that conveyance, the parties were at variance in manner already related, and concerning which the court adopted the mother's view of the dispute, also as we have seen.

It further appears that in April, 1937, the daughter and her family, accompanied by her mother, who had continued to live with the said daughter in Pittsburgh, removed to Denver and into the Denver residence property; that in December, 1938, the daughter's husband already having gone therefrom, the daughter left as well, leaving her mother living in the basement of the property, the remaining portion being rented to those attorning to the daughter; that when the daughter was gone, the mother left the premises and promptly began this suit.

It further appears that the daughters were not on good terms, and frequently indulged in unseemly quarrels between themselves in the presence of their mother, and neither of them and their brother enjoyed friendly relations. All were adults and married. Defendant and her husband did not live harmoniously. The husband drank excessively, and in gratification of that habit, and another, he expended funds which evidently should have been employed in the support of his family. The husband and wife engaged in boisterous quarrels, and on one occasion police officers were called to quell the disturbance. Out of the untoward lives of defendant and her husband, such conditions obtained in the daughter's home that the mother was distressed, and the comforts which her generosity reasonably entitled her to enjoy at the hands of the recipient of her bounty, were largely void of realization. Finally, the mother and daughter quarreled, and in instances they engaged in physical encounters. Appraising the entire situation, the court remarked that a "disgraceful family feud" existed. Another incident which caused discord was, that, without the mother's knowledge or consent, the daughter gave a mortgage on the home property to secure payment of a loan of two thousand dollars which she had borrowed. Again, and while they still were living in Pittsburgh, the mother and daughter deposited their funds in a common bank account. The daughter's explanation relative to withdrawals therefrom was evasive and unsatisfactory. It is clear that such an account was of no advantage to the mother. Throughout the daughter's testimony she engaged in voluntary statements calculated to reflect upon her aged mother, going so far as to say that her mother had abused "poor old dad" in his lifetime. The answer to all her implications in that regard, as we think, is that the father left his material accumulations to the mother of his children—not to the children.

■ In the circumstances of the record, we think the court erred in holding that the mother's right of sup-

port failed through her own fault. Any fair reading of the record will convince that conditions in the daughter's home were intolerable. Besides, it should be emphasized that the daughter's attitude was that she would support her mother, and had been doing so, because of her devotion and not because she had contracted to that effect. Why should this. mother, broken with toil and weakened with age, be required to go creeping back to such environment? The law does not require it, and equity should relieve from such humiliation. "Ordinarily," says the Iowa Supreme Court, "where a person has parted with his property in consideration of an agreement for support for life and discord thereafter arises between the parties, as it too often does, courts are disposed to give the grantor the benefit of all reasonable doubt, and restore the property if it can be done without manifest injustice to the grantee." *Lewis v. Wilcox,* 131 Ia. 268, 108 N.W. 536. "The friction between the parties had become so apparent and deep-rooted that it seemed to the court impossible for them to carry out the spirit of the contract." *Johnson v. Paulson,* 103 Minn. 158, 114 N.W. 739. So here. See, *Caldwell v. Mullin,* 101 Colo. 113, 71 P. (2d) 415; *Carroll v. Coombs,* 91 Colo. 73, 11 P. (2d) 808. To require the daughter to reconvey the property would deprive her of nothing which she has acquired through sacrifice on her part, and relief, therefore, should be granted in accordance with the comprehensive prayer of the mother's complaint.

That appropriate decree may be entered, let the controverted judgment be reversed.

MR. CHIEF JUSTICE FRANCIS E. BOUCK does not participate.